Our fifth case for today is United States v. Adrian Ruiz. You might just wait a half a second, Ms. Pollack, while we clear out the courtroom, because we don't want to be shouting over people. I didn't think I was going to make it up to you. Okay, why don't we begin. My name is Elizabeth Pollack. I'm with the Federal Defender's Office for the Central District of Illinois, and I represent the appellant Adrian Ruiz in this case. The first issue to discuss is the fact that on the date that Mr. Ruiz was arrested, he never should have been pulled over in the first place, because the investigating officers who were tailing him did not even have reasonable suspicion that any criminal activity had occurred or was getting ready to occur. And this is something that the district court called a close call when the district court issued the ruling in this case. So don't we have a lot of stacking? I mean, there's the first vehicle where they're doing surveillance, apparently unrelated to Mr. Ruiz, but then they trace the registrations of all these other vehicles, and then we have the moment at the Gurney Mall's shopping mall parking lot where he's, I don't know how anybody could see whether he's operating the air conditioner, but if he's operating the windshield wipers and the windows in strange ways, perhaps a trained officer could think he's not really operating the windshield wipers and the windows. Sure. I appreciate that. And just to address one point in there, the officer actually testified on page 71 of the transcript that they couldn't really see what was happening in the vehicle, because you think if somebody's doing a covert operation, they're not close enough to actually see what's happening in the car. You could see the windshield wipers. You could see if the wipers went on. That's correct. But he ultimately said he didn't know when confronted with specifically what was happening with the vehicle. He gave some examples of, I don't know, he was fiddling with something on the dashboard, then he turned around into the car, so they couldn't really see everything that was happening. I guess this is the end of October, that it just strikes him as weird that these, I mean, if it's not raining and you're flapping around the windshield wipers, you might be suspicious. But the question, I think that perhaps his behavior was slightly suspicious, but the question is, what are they suspicious of? They could be suspicious of the fact that he was friends with people who had popped up in their drug investigation. They could be suspicious of the fact that he was operating his car in a way that looked kind of funny to them. But reasonable suspicion isn't, this guy's not acting right. Reasonable suspicion is, was there evidence that there was suspicion of criminal activity going on either immediately prior to or was about to occur? Absolutely correct. But don't we also have the fact that he gets in the back seat of the third vehicle for a brief period of time and then gets back out again and walks in two different directions? Well, to answer that question, first of all, I think that could seem completely innocent. I mean, they're running into each other in a mall parking lot. You're stopping in to say hi to somebody. But he starts toward the passenger side of the front seat and then gets right in behind the driver. Right, yeah, somebody was in the front seat. So it's not the normal way to walk to a vehicle, but the question is... Was there evidence that somebody was in the front passenger seat? I don't think there was any evidence as to who was in that car at all. But it's reasonable to think, OK, well, somebody's in the seat, so I get in the other side. So he's walking back and forth. But the question is, at no point during this entire day did any law enforcement officer see, hear, smell, or observe anything illegal. From the minute they started following the first individual, who was Michael Coleman, who had come out of that storefront, imagine that, and gotten into the very first car. So it's car to car to car to this guy. Correct me if I'm wrong. There had been some buys accomplished in connection with that store, right? Previously, although there's no real timeline on when that had occurred. And on that morning, nobody saw Michael Coleman with anything. There was no bag. All he had in his hand was a cell phone. And so he's coming out of a store that had previously been associated with drug activity, but nothing on that date. Cars are driving around. They're meeting up with other people. They're following them around for a period of time. And at no point do they see Mr. Rees or any of the other people with anything in their hands whatsoever. They just guessed right? Pardon? They just guessed right? Well, I guess it turned out well for him, but that's not the issue, is it? The issue is, what does a normal person... Well, but that might provide to be less facetious. They weren't guessing. I think they had a feeling that he would have known some of those people, but they did not have any evidence that he had anything in that car on that date. And that is exhibited by the officer's testimony. When they observed Mr. Rees get out of the Honda and to vehicle number three, he wasn't carrying anything with him. He didn't see anything in his hands. They couldn't see anything whatsoever. But they don't stop him then. Well, they also don't see him get out of that vehicle with anything. When he got back into his car, they couldn't see him holding anything. And so they continue to follow him. And suspicious activity continues. We're talking, just to make sure we have the legal framework right, we're talking about a Terry stop of him. We're not talking about full-blown probable cause, which is clearly not there. But is there, by the time he's in the rental car driveway spots, the car decides he's leaving or not leaving, is there at least enough for a Terry stop? And at that point, I'd say no, because what is the criminal activity? That's the thing. What they're using to say that it was suspicious, because when he observed a police officer following him, Rees decides to not break any traffic laws. And that is key in and of itself, because frankly, I don't know anybody in this courtroom who hasn't noticed a cop on their tail and then decided, well, I think I won't speed until that person is gone. That's a normal behavior. And the other thing is that they asked that traffic cop, go find probable cause, because they didn't have any. There was nothing going on. They couldn't stop him at that point. And they knew it. These are experienced agents. So they said, OK, local cop, please follow this guy and drum up something so we can stop him. Did they say drum up something? They said to produce. The word exactly is to, I can't remember what it is, but they said to produce probable cause. They said develop. Yes, they said develop probable cause. And so they didn't have it. And that's the point. Before they even get him in the driveway, he's not doing anything except acting kind of weird. And I'm sorry, but acting kind of weird is not enough to stop somebody. But successively weird doing weird things that are consistent with drug dealers gives you enough to make a terrorist stop. But it doesn't, because you have to be suspicious of criminal behavior or of impending criminal behavior. All right, running one of your windshield wipers and fiddling around with the dash starts it off. I suppose that, not really, but I don't think that's the point that anything really happens. Because before that happens, they see him get out of this car, there's nothing in his hands. That's consistent with using a trap, though, isn't it? With using a hidden compartment. But they saw him walk back and forth between the cars. And so if he was going to be using a trap as a trap, he'd have to have something. And there was one of those cases, you've got to have something put in there. He doesn't have to have it in his hand. Well, it's got to be somewhere, and they didn't see anything. He didn't have a bag, he didn't have a backpack, he didn't have anything. And they couldn't see it at all. So yeah, it might be consistent. Turning a bunch of things on in the car or fiddling with a dashboard might be consistent with using a trap. It's also totally consistent with innocent behavior, like checking your mirrors or turning the music on and putting stuff in the glove compartment. But he does it again in the driveway of this rental house, right? Doesn't he fiddle again? They say. Well, they do. They testified to that, and the judge found them credible. That's true. They say they saw him look around in the backseat and step on the tail light or step on the brake a few times. Right, right, right. Which is different than, they don't say they saw him replicate the behavior that they saw in the parking lot. They said some different things happened in the driveway. But still, once he's in the driveway, once they get out of the car, that's the beginning of the stop. And there was nothing, there is no evidence before that moment that he was engaged in any criminal activity or was about to engage in any criminal activity. Well, your argument has to be that by that time they have a hunch, but they don't have more than a hunch. Well, and a reasonable suspicion isn't just weird behavior. It's got to be more than that. People have been known to turn windshield wipers on while they were trying to get the turn signal or whatever. Or something. I mean, you get in the car, you adjust your mirrors, you open the glove box, shove some napkins in, you maybe look around, check behind you. I mean, there's all kinds of things that you do in a vehicle that could look like it's consistent with a trap. Well, your license, you're registered in Wisconsin, and you pull into a driveway that says for rent. There's tons of people with different state license plates driving around the Chicago area and in other areas. Where was he licensed? His license was from Texas. What a surprise. Which they didn't find out until they went in the car and got him out and looked at it. I see that I have a light on here, so if the court has no further questions, I'll reserve for rebuttal. That would be fine. Thank you. Mr. McFadden. Good morning, Your Honors. May it please the court, Chris McFadden on behalf of the United States. The officers clearly had reasonable suspicion to approach that car when it was in the driveway. I'm not sure clearly is the right word for this. I mean, it's thin, really. I mean, if you think of each step along the way, association with people who are drug dealers, maybe yes. If he's, you know, if all of these cars that are registered to people under investigation get brought together. But he sits down in a car, doesn't seem to do anything, then comes back, then fiddles around with these controls. I actually thought the agent's comment about the air conditioning was something that detracted from the probable cause. Since I don't know any way myself, maybe it's my lack of knowledge of cars, that I would know whether somebody across the mall in Gurney Mill had turned on their air conditioner or not. Let me try to respond to some of that. There's a lot wrapped up in there. First of all, as you know, we're talking about less than probable cause. We're talking about making common sense inferences, and officers can make these decisions based on their training and experience. And in this case, it was substantial. You've got to distinguish between hunch and reasonable suspicion with articulable facts. I agree. And as the district judge found, there was definitely reasonable suspicion here. And let's just talk. Somebody gets into their car for 30 seconds. And it has to be suspicion of drug activity here. There's no other crime that's potential from this, right? Correct. I'll focus on what I think are probably the two strongest pieces of evidence here. First is that the judge found that he acted consistently with operating a trap. A trap has no other purpose in a car other than to hide drugs. For 30 seconds when he gets into the car, he steps on the brakes, and then he does a sequence of about three or four things, which in the middle of October included doing things like running the windshield wipers when there's no rain, rolling down the windows when it's cold. There was evidence in the record it was cold. And then he didn't just do it then. He did the same similar type thing. This is at page 77 in the record. The agency, when he pulls into that driveway, he does a similar type pattern, another three- or four-step sequence. Steps on the brakes, three- or four-sequence thing, and also after doing that both times, he also takes and reaches from the front seat into the back seat. So unless there's some evidence in the record that the guy has OCD or some type of compulsive disorder, which we don't have, these are things that the district judge found were consistent with the operation of a trap. And the judge specifically credited that, and that's subject to clear air review. Does the record reflect where? I mean, he shows him the trap, of course, eventually. But does the record reflect where it was? Because I'm having trouble imagining him in the driver's seat without really turning into a pretzel, you know, finding a trap there in the back seat with all of this. Yeah, I don't think it says in the record exactly where the compartment was. It was in the record that there were two different compartments, and it was in the record that both times the defendant is reaching from the front into the back. And related to this, because I said what are the two strongest pieces of evidence, the second is that the defendant appeared to do it the second time for no real reason other than to just make sure that the trap was still working. And let me explain. With the police right out front? No. He seems reckless. Well, no, because that's not the factual record, respectfully. What happened is he's driving along. He's happy. Then he notices that he's being followed by a marked squad car. Then he drives into a neighborhood, pulls into a driveway. The district judge found that the defendant was not acting like somebody looking to rent a house. He didn't get out and look at the house. Instead, what he does is he waits for the squad car to drive by, and it gets out of sight. At that point, the defendant then engages in that same three- or four-step sequence, which was consistent with operating a trap. So this is observed by the people in the plane who are monitoring from some distance. And does he start to back out of the driveway? Yes. When the squad car is still gone, he begins to back out. The squad car then, because I think it was a one-way street or for whatever reason, the squad car turns around. When it is coming back into view of the defendant, he then puts the car back in park and decides he's just going to sit there again. It was at that point. Before he gets out of the driveway. He's still in the driveway. Correct. He never pulled out of the driveway. He never looked at the house. Really, he waited for the squad car to go by. He did those three or four steps again. The squad car is coming back again. He stops and he puts the car back in park. That was the point when the agent and the task force officer felt that they had reasonable suspicion to approach him, and that was when they did that. In terms of some of the other evidence that led up to this, I think there were multiple questions about that, but you did have some inferences that there had, and it was page 18 of the response brief, this was a store known for drug involvement where there had been people who left and were arrested within about three or four months prior to that. Vehicle number three, which was the one that was in the parking lot, was registered to a targeted investigation who was believed to be a source for the drug trafficking organization. Michael Coleman, the guy who walked out of the storefront, had convictions for drug dealing. He was on a cell phone. True, nobody ever saw drugs in the defendant's hands, but there was testimony that 300 grams of heroin basically is the size of a baseball, so that could be hidden. I mean, I could have it in my jacket here today. You could have it under your robe. We wouldn't know that it's there. My point being, this is the first time I've ever told a joke in oral argument. I'm not going to try to do that again. So the only people in the United States who know anything about the metric system are the drug dealers. I know. We say that too sometimes. As far as I'm concerned. So once he's out of the car, though, the interaction with the police, isn't he compelled to answer their questions? Isn't his car basically trapped in that driveway? It wasn't judged for several reasons. First of all, this court, I think the case that we cited, but it's in multiple cases, the factors, we cited the Snodgrass opinion, but to your specific point, he was not blocked in. He's in a driveway, and one of the undercover cars is over here. Another undercover car is down here. But is he really going to squish out between these two cars that are bracketing the driveway and zip off? I mean, it just doesn't seem realistic. Yeah, I don't know if that's the record that it was actually bracketing the driveway. It's that one of them was over here a little bit, and one was over here a little bit. Where's the patrol car? The patrol car was about two or three houses down on the opposite side of the street, and that officer never approached. She just stayed in her car. I'm picturing just a, and you can get this off of Google, just picture a regular subdivision, and you have a car two or three down. That's not going to block anybody's traffic. And to have cars on either side like this but not blocking the driveway, that's not blocking him in either. But as for the other more routine factors, all of these encounters were in a public place. He was never moved. They never touched him in any way. They were in plain clothes. There was no use of force, no display of weapons. And the one finding that the judge kept repeating was that in terms of the way that they dealt with him, it was in a calm and cooperative way, which was designed basically to convey to him that this was not a formal arrest, that this was at most a Terry stop, and that he had the right to say no at certain points. Unless the court has any other questions for me, I'll just submit on our briefs. All right. Thank you very much. Thank you. And we'll hear again from Ms. Pollack. I just want to refer the court to the portion of the testimony of the officers about what was observed in that parking lot. It's on page 71 of the transcript. And in that testimony, the officer says, I noticed him put on the parking brake. Oh, wait, no, not the parking brake. He stepped on the brake. I could see the brake lights. Once he did that, I saw him manipulate some of the controls up in the front, the driver controls. I don't remember exactly which controls it was. But I was directly, not directly behind, but I was behind him so that I could see him maybe turn on the air conditioner or maybe turn it off or maybe the windshield wipers or the windows. And then maybe three or four steps into it, he turns around and reaches behind him. That is by far not the definitive testimony that we've heard represented in both the government brief and also by the district judge in the ruling, which says, you know, that's much more definitively stated. I saw these things. These steps were taken. That's not what the testimony says. He thinks he was fiddling around with it, but he can't actually see it. He thinks it's a trap, but he doesn't see any drugs. And for those reasons, there was not reasonable suspicion to stop Mr. Ruiz in that driveway. And I see my time has expired. Can I make one final point? One final point. My final point is that when you're sitting in a driveway and there's two undercover officers parked on either side of that driveway, even if it's five or 25 feet away, you can't leave. You feel like you can't leave. He gave them permission to search his vehicle. They came up with nothing, and still they kept him in the driveway. He didn't voluntarily go to the police station and didn't voluntarily, after having one failed search of the car, say, oh, now I really feel like telling you that there's drugs in my vehicle. Here you go, silver platter. You can't buy that. And for those reasons, not only did they not have reasonable suspicion to search the vehicle in the first place, but he also was held beyond the scope of any Terry stop that was legitimate, and the search should have been suppressed. Thank you. All right, thank you. Thank you very much. We appreciate your efforts on behalf of your client, and we, of course, appreciate the government's work as well.